1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JITKA BLAHAKOVA,

                Plaintiff,

           vs.

JO ANNE B. BARNHART,
Commissioner of Social
Security,

               Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 05-6612 (OP)

MEMORANDUM OPINION; ORDER

**I.**

**INTRODUCTION**

     On September 8, 2005, Plaintiff Jitka Blahakova ("Plaintiff"), filed a Complaint seeking review of the Commissioner's denial of her application for Disability Insurance Benefits ("DIB").  On May 8, 2006, in accordance with the Court's Case Management Order, the parties filed a Joint Stipulation ("JS").  Thus, this matter now is ready for decision.

**II.**

**BACKGROUND**

     At the time of the hearing, Plaintiff was a forty-eight year old former

architectural designer (Administrative Record ("AR") at 40.)[1]  She filed her application for benefits on May 26, 2004, alleging inability to work since February 2, 2004, due to blindness in the right eye and spotty vision in the left eye. (AR at 59-61, 64.)  She also reported that she had stopped working on February 6, 2003, because she was laid off from her job. (AR at 64.)  At the time of the hearing, Plaintiff also alleged, among other impairments, fibromyalgia and depression. (AR at 43.)  Following the denial of her application (AR at 53-57), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[2]  (AR at 32-33.)  On January 25, 2005, a hearing was held (AR at 36-51), and on April 29, 2005, the ALJ issued her decision, finding that Plaintiff was not disabled. (AR 16-20.)

As reflected in the hearing decision, the ALJ found that Plaintiff suffered from "a severe visual impairment and multiple non-severe physical and mental impairments," consisting of skin rashes, history of seizures, normal or slightly diminished vision in the left eye, fibromyalgia, and depression. (AR at 17, 19.)  However, the ALJ further found that: Plaintiff's impairments did not, singly or in combination, meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P of the Commissioner's regulations ("Listing of Impairments" or "Listing"); Plaintiff's subjective allegations were not entirely credible; and Plaintiff retained the residual functional capacity ("RFC") "to

[1]  Plaintiff testified at the time of the hearing that she was forty-two. (AR at 40.)  However, her date of birth is December 15, 1956 (AR at 59), which would make her forty-eight on January 25, 2005, the date of the hearing. (See also AR at 124.)  In either case, she is a "younger person" as defined in the regulations. 20 C.F.R. § 404.1563(c).

[2]  As part of the Commissioner's testing of modifications to the disability determination process, the reconsideration level of appeal was eliminated in certain randomly selected cases. 20 C.F.R. § 404.906(b)(4).

perform work at all exertional levels," except that "she cannot perform work activity requiring good monocular vision or depth perception." (AR at 19.) The ALJ determined that Plaintiff lacked the RFC to perform her past relevant work due to her poor depth perception. (AR at 20). However, based upon her medical-vocational profile and RFC, using the framework of Section 204.00 of Appendix 2, Subpart P of the regulations, and relying upon the testimony of the vocational expert ("VE"), the ALJ found that there were a significant number of jobs in the national economy that Plaintiff was capable of performing. (AR at 19, 20.) Accordingly, the ALJ concluded that Plaintiff had not been under a "disability" as defined in the Social Security Act at any time through the date of the decision and, therefore, was not eligible for DIB. (AR  at 20.)

Plaintiff's request for Appeals Council review of the decision was denied (AR at 4-6, 7-8). Consequently, the ALJ's decision stands as the final decision of the Commissioner in Plaintiff's case. The timely filing of the current action followed.

### III.

### DISPUTED ISSUES

As reflected in the Joint Stipulation, Plaintiff raises the following disputed issues as grounds for remand:

1.   Whether substantial evidence supported the ALJ's finding that Plaintiff's fibromyalgia was not severe;

2.   Whether substantial evidence supported the ALJ's finding that Plaintiff's depression was not severe;

3.   Whether the ALJ considered Plaintiff's testimony and made proper credibility findings;

4.   Whether the ALJ properly relied upon the vocational expert's testimony.

/ / /

3

1

## IV.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied.  <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); <u>Desrosiers v. Secretary of Health & Human Servs.</u>, 846 F.2d 573, 575-76 (9th Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson</u>, 402 U.S. at 401.  The Court must review the record as a whole and consider adverse as well as supporting evidence.  <u>Green v. Heckler</u>, 803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld.  <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir. 1984).

## V.

## DISCUSSION

A.    <u>Substantial Evidence Does Not Support the ALJ's Findings That Plaintiff's Fibromyalgia and Depression Were Not Severe</u>

Title 20 C.F.R. § 404.1521 defines a "non-severe impairment" as one which does not significantly – i.e., more than minimally – limit one's physical or mental capacity to perform basic work-related functions.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 154, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Examples of such functions would be the ability to sit, stand, walk, lift, carry, push, pull, reach, or handle; see, hear, and speak; understand, remember, and carry out simple instructions; use judgment; respond appropriately to supervisors, co-workers, and usual work situations; and deal with changes in a work setting.  20 C.F.R. § 404.1521.  This analysis is "'a de minimis screening device to dispose of

4

groundless claims.'"  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)
(citing Bowen, 482 U.S. at 153-54)).  A finding of a non-severe impairment is
appropriate only when the "medical evidence establishes only a slight
abnormality or a combination of slight abnormalities which would have no more
than a minimal effect on an individual's ability to work . . . "  Social Security
Ruling ("SSR") 85-28; see also Bowen, 482 U.S. at 154 n.12.  This assessment,
therefore, is independent of considerations of age, education, and vocational
background.  Bowen, 482 U.S. at 151-54; Corrao v. Shalala, 20 F.3d 943, 949
(9th Cir. 1994).

In this case, the ALJ found that Plaintiff's visual impairment was severe
but that her fibromyalgia and depression were not severe.  (AR at 19.)  For the
reasons set forth below, this Court finds the ALJ's findings were not supported by
substantial evidence.

### 1. **Plaintiff's Fibromyalgia**

### a. **Medical Background**

The medical record indicates that, in February 2003, Plaintiff was seen by
her primary care physician with complaints of fatigue, myalgias, joint pain, back
pain, abdominal pain, and non-restorative sleep.  She reported that some days
were better than others, that she could not remember a "good time," and that she
was able to exercise about twice a week.  She also reported that she had recently
quit her job ("2 wks ago").[3]  (AR at 122.)  The physician's assessment was of
questionable fibromyalgia.  (Id.)

Shortly thereafter, on March 31, 2003, Plaintiff was seen by Dr. Lillian
Szydlo in the Rheumatology Department of Cedars-Sinai Medical Group.  (AR at
124-25.)  Plaintiff complained of pain in multiple areas of the body.  In addition,

---

[3] In Plaintiff's application for benefits, she reported that she had been laid
off on February 6, 2003.  (AR at 64.)

she complained of headaches, irritable bowel syndrome, depression, anxiety, non-restorative sleep, and side effects from Effexor, a pain medication. However, she was not able to discontinue use of Effexor altogether because that made her feel "uncomfortable." (AR at 124.)  Physical examination revealed pain with palpation of the sternum, shoulders, and buttocks area. Plaintiff was advised to do stretching exercises, yoga, aerobic conditioning, and meditation. Medications also were prescribed, and Plaintiff was instructed to call again in one week. (AR at 124-25.)

There is no record of any further communication with Dr. Szydlo in 2003, and Plaintiff's calls to her primary care physician in May 2003 did not indicate any significant fibromyalgia-related complaints. (AR at 122.)  On April 23, 2004, however, she did begin treatment with Drs. Amor Srikureja and James Follette, complaining, inter alia, of "lots of pain" in her joints, headaches, very poor sleep, and anxiety. She reported that these complaints, together with her eye problem (a sudden loss of vision in her right eye in November 2003), were affecting work. (AR at 146.)  She denied that she was a hypochondriac. (Id.)  She was prescribed medication, including a trial of Lexapro for her depression and anxiety. (AR at 145.)  She reported that she had seen George N. Suel, Ed.D., for psychiatric problems. (AR at 144.)  In May 2004, she was given samples of Neurontin and told to continue Effexor. (AR at 143.)

On May 14, 2004, Plaintiff returned to Dr. Szydlo to whom she related her November 2003 history of sudden loss of vision in her right eye. (AR at 116.)  She also told Dr. Szydlo that she had attempted to discontinue Effexor but was not able to do so because it resulted in an increase in muscle and joint pain. (Id.)  She had resumed the medication two weeks earlier and reported it was "already helping some." (Id.)  She also reported that Neurontin was helping somewhat. (Id.)  Nevertheless, Plaintiff complained of headache, increased joint pain, rashes, and severe fatigue which made it hard for her to work. (Id.)  Physical

6

examination revealed multiple tender points consistent with fibromyalgia. (AR at 118.) Dr. Szydlo increased Plaintiff's dosage of Effexor and Neurontin.

Plaintiff next visited Dr. Srikureja in November 2004 and reported that she had been "so so." (AR at 143.) She now was exercising/swimming four to five times a week but continued to complain of a lot of joint pain and marginal sleep, and she reported that she had seen a therapist, acupuncturist, and rheumatologist. She reported that Neurontin helped a "little bit." (AR at 143.) She also reported that she had been seeing a retinal specialist for the problem with her right eye. (Id.)

In June 2004, Plaintiff again saw Dr. Szydlo. She reported no new visual complaints, and laboratory work was negative. She brought in pictures of herself with an extensive rash, but the rash had not recurred in three months. (AR at 113.) Increased Effexor helped with her pain, but the pain still varied in degree. (Id.) She reported that she could work. (Id.) She had discontinued use of Neurontin, which she believed constipated her and was not "'the miracle drug.'" (AR at 114.) Plaintiff also complained of a little swelling in the fingers and toes, night sweats, and cough, especially when she was tired or had eaten certain foods. (Id.) Fatigue was intermittent. (Id.) A physical examination again revealed multiple tender points of fibromyalgia, mild. (Id.) Otherwise, the examination was normal, and the fibromyalgia was said to be at a "tolerable" level. (Id.) Plaintiff was still on Effexor and declined any additional medications. (AR at 115.)

On January 6, 2005, Plaintiff returned to Dr. Szydlo. (AR at 148.) She related that she had some peripheral vision in the right eye and that her visual condition was essentially stable and not expected to get better. (Id.) Plaintiff was still taking Effexor and occasionally, Neurontin, as well as Naprosyn or Ibuprofen as needed. (Id.) Physical examination revealed multiple (more than eleven) tender points, and Plaintiff was observed to be tearful. (Id.) Assessment was

1    "FMS severe with depression."  (Id.)

2    On February 14, 2005, after the hearing date, Dr. Szydlo completed a

3    questionnaire entitled Fibromyalgia Residual Functional Capacity Questionnaire.

4    (AR at 174-78.)  Dr. Szydlo indicated, inter alia, that Plaintiff met the American

5    College of Rheumatology criteria for fibromyalgia and that prognosis was poor.

6    (AR at 174.)  She listed a host of symptoms, including "total body pain,"

7    swelling, chronic fatigue, pressure headaches, irritable bowel, muscle weakness,

8    vestibular dysfunction, numbness and tingling in the feet, and depression and

9    anxiety.  (AR at 174.)  The only clinical findings noted were of the vision loss,

10   multiple tender points, and depressed affect.  (Id.)  Laboratory work was normal.

11   (Id.)  Dr. Szydlo opined that Plaintiff was not a malingerer and that emotional

12   factors contributed to the severity of Plaintiff's symptoms and functional

13   limitations, as was true of all fibromyalgia patients.  (AR at 175.)  She indicated

14   that the nature and frequency of the pain was "constant and chronic," and the

15   severity in the past year had been "moderate to severe."  (Id.)  As to Plaintiff's

16   functional capacities, Dr. Szydlo opined that she could stand/walk for less than

17   two hours in an eight-hour workday, that she could sit only about two hours in an

18   eight-hour workday, that she would need unscheduled breaks every hour for

19   fifteen minutes, and that she would be absent from work about three days per

20   month which, in conjunction with her visual loss, pain, fatigue, and CNS

21   impairment, were incompatible with the ability to sustain substantial gainful

22   employment.  (AR at 176-78.)

23                    **b.    The ALJ's Assessment**

24   The opinion of a treating physician is generally entitled to greater weight

25   than the opinion of a physician who has examined, but not treated the claimant.

26   This is so because the treating physician is employed to cure and has a greater

27   opportunity to know and observe her patient than a physician who only saw the

28   claimant on one occasion.  This is not to say, however, that the opinion of even a

8

treating physician is "necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).  Even the uncontradicted opinion of a treating physician can be properly rejected for clear and convincing reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).

Here, the ALJ rejected Dr. Szydlo's assessment, noting the disparity between the pre-hearing progress notes and reports indicating "essentially normal findings and intermittent, tolerable symptoms," and the post-hearing questionnaire indicating a greater level of severity.  (AR at 18.)  In rejecting Dr. Szydlo's extensive restrictions as set forth in the questionnaire as being inconsistent with her progress notes and findings, the ALJ provided sufficiently specific, clear, and convincing reasons for doing so, and Plaintiff apparently does not argue otherwise.  See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (the ALJ properly found that the treating physician's "extensive conclusions regarding [claimant's]  limitations are not supported by his own treatment notes."); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (the ALJ's rejection of a treating physician's opinion that claimant could not work was proper when it conflicted with a prior contrary opinion, and "[t]he record contains no information to support a change of that opinion"); 20 C.F.R. § 404.1527(d)(2)(I) (the "[l]ength of the treatment relationship and the frequency of examination" are considerations in evaluating opinion evidence).

However, the fact that the ALJ provided sufficiently clear and convincing reasons for rejecting Dr. Szydlo's opinion of disabling restrictions as expressed in the questionnaire does not mean that substantial evidence supports the ALJ's conclusion that Plaintiff's fibromyalgia is not "severe."  Although Dr. Szydlo's treatment notes indicate that Plaintiff's fatigue and exhaustion were intermittent and that the pain was relieved by medication and made "tolerable" (AR at 114),

and her notes indicate that Plaintiff could work (AR at 113), the record also indicates complaints, albeit intermittent, of "very severe" fatigue. (AR at 116.) There also is repeated indication of "lots of pain" in her joints. (AR at 122, 143, 146.) There is no indication that Plaintiff's pain was completely resolved. (AR at 113.) To the contrary, although Plaintiff could work, she also reported that it was "hard to work" (AR at 116), and Dr. Szydlo's treatment notes indicate the ongoing presence of the fibromyalgia tender points to objectively and clinically corroborate at least some level of impairment, thereby meeting the "de minimis" threshold requirements of a "severe" impairment limiting Plaintiff's physical capacity to perform basic work-related functions.

The Commissioner's arguments concerning Plaintiff's ability to work despite her fibromyalgia and her failure to allege fibromyalgia as a disabling impairment are unpersuasive in the context of a step two "severe" impairment analysis, because Plaintiff has "never claimed . . . that the Fibromyalgia caused her to stop working." (JS at 8.) Evidence sufficient to support a finding that Plaintiff is not disabled by reason of her fibromyalgia does not necessarily support a finding that her fibromyalgia was not, at the very least, severe. Many people are able to work in spite of significant functionally limiting impairments. As a result, the ability to work and the existence of functional limitations are not mutually exclusive. What is clear is that, in rejecting Dr. Szydlo's opinion of disability and in relying upon Plaintiff's failure to allege fibromyalgia as a disabling impairment, the ALJ and the Commissioner are applying a step five standard to a step two issue. Thus, they have improperly "applied a more stringent legal standard than is warranted by law." Edlund, 253 F.3d at 1158.

Although Dr. Szydlo's highly restrictive assessment was properly rejected, the record as a whole does not support a finding that Plaintiff's fibromyalgia was not severe.

**2.      Plaintiff's Depression**

10

1    Plaintiff contends that the ALJ's finding that her depression was not severe
2  is not based upon substantial evidence.  Plaintiff primarily relies upon the Mental
3  RFC questionnaire completed by her "treating psychiatrist," George Suel, who
4  opined that Plaintiff was "unable to meet competitive standards" in completing a
5  normal workday/workweek with respect to unskilled work and was seriously
6  limited in, but not precluded from, dealing with normal work stresses with respect
7  to semiskilled or skilled work.  (JS at 9; AR at 171-72.)  Plaintiff also relies upon
8  intermittent references to depression in her treatment records, Dr. Szydlo's
9  observations of depression and anxiety, and Dr. Szydlo's recent one-time
10 characterization of Plaintiff's depression as "severe."  (JS at 9.)

11   The ALJ acknowledged April 2004 references in the record to depression
12 but found that there was "no further mention of depression or anxiety until
13 January 2005."  (AR at 19.)  Accordingly, the ALJ found "that the degree of
14 severity assessed is not supported by progress/treating notes documenting
15 frequency and/or the types of treatment sought and obtained."  (Id.)

16   It is not entirely clear from Plaintiff's testimony what work-restrictions, if
17 any, Plaintiff is alleging as a result of her depression.  (AR at 43, 45-47.)  Dr.
18 Szydlo opined in her questionnaire that Plaintiff's depression and anxiety were
19 "severe" (AR at 174), and that emotional factors contributed to the severity of
20 Plaintiff's fibromyalgia symptoms and limitations.  (AR at 175.)  Other than a
21 reference to depression during the initial evaluation of March 31, 2003, however,
22 there is no mention of depression again in Dr. Szydlo's notes until January 2005.
23 (AR at 148.)  Thus, the ALJ's finding that Dr. Szydlo's assessment of Plaintiff's
24 depression is unsupported by her progress and treating notes is based upon
25 substantial evidence.  (AR at 19.)

26
27
28

11

As for Dr. Suel's opinion,[4] the ALJ acknowledged the "marked" limitations in dealing with work stress and completing a normal workday or workweek but implied that Plaintiff's multiple symptoms and Dr. Suel's assessments of function translated into only "moderate limitations in [Plaintiff's] ability to deal with the stress of semi-skilled and skilled work . . ." (AR at 18; see AR at 172.)  Plaintiff argues that Dr. Suel's opinion that Plaintiff cannot engage in substantial gainful activity is consistent with the evidence and, therefore, should be accorded controlling weight.  (JS at 10; see 20 C.F.R. § 404.1527(d)(2)).  She also argues that specific and legitimate reasons are required for rejecting Dr. Suel's opinions. (JS at 10.)

Controlling weight can only be given to a "physician."[5]  Dr. Suel is not a physician, but rather a marriage and family therapist and hypnotherapist.  (AR at 136.)  The fact that "the ALJ had no problem addressing Dr. Suel as an acceptable medical source" (JS at 13) does not make him one.  20 C.F.R. § 404.1513.  This does not mean, however, that the ALJ can ignore Dr. Suel's opinion.  Such an opinion may, for example, qualify as evidence from "other sources" to show the severity of impairment(s) and how they affect Plaintiff's ability to work.  20 C.F.R. § 404.1513(d).  The Commissioner argues that the ALJ did not ignore Dr. Suel's opinion but rather found that his assessment was not inconsistent with the

---

[4] Dr. Suel apparently has a Doctor of Education (Ed.D.) degree (see AR at 136), thereby rendering appropriate the honorary title "Doctor."  He is not, however, a medical doctor.

[5] Title 20 C.F.R. § 404.1527(d)(2) accords controlling weight under certain circumstances  to "treating sources."   A "treating source" is defined in 20 C.F.R. § 404.1502 as the individual's "own physician, psychologist, or other acceptable medical source." (Emphasis added.)   "Acceptable medical sources" are listed in 20 C.F.R. § 404.1513.  The list does not include marriage and family counselors or hypnotherapists.

ALJ's finding that Plaintiff had a non-severe mental impairment. Specifically, the Commissioner argues that:

> Mr. Suel opined in the questionnaire that Plaintiff had, at least, a
> "satisfactory" mental ability to deal with the stress of semi-skilled
> and skilled work. (AR 172.) This was not inconsistent with the
> ALJ's finding that Plaintiff had a non-severe mental impairment that
> did not affect her ability to perform "basic" work activities.

(JS at 11.)

This argument is without merit. There is nothing in Dr. Suel's questionnaire responses that suggests that Plaintiff's depression was not severe. Dr. Suel assessed that Plaintiff's ability to deal with the stress of semi-skilled and skilled work was "seriously limited, but not precluded" (AR at 172), not "satisfactory" as the Commissioner contends. (JS at 11.) These assessments do not support the ALJ's finding of a non-severe impairment.

The Commissioner also argues that Dr. Suel's opinion does not qualify as the opinion of "other sources" to show the severity of Plaintiff's impairment because "[c]ontact only once per week for counseling sessions falls far short of the daily observation necessary to impose a duty on the ALJ to consider a lay witness statement." (JS at 12.) This argument is equally without merit. There is no requirement that a lay witness have "daily observation" of a claimant. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) ("An eyewitness can often tell whether someone is suffering or merely malingering. While this is particularly true of witnesses who view the claimant on a daily basis, the testimony of those who see the claimant less often still carries some weight"). Moreover, the regulation specifically lists "therapists" as "other sources to show the severity of [an individual's] impairment(s)." 20 C.F.R. § 404.1513(d).

Because he is not a treating physician, specific and legitimate, or clear and convincing reasons are not required to reject Dr. Suel's opinion. Instead, as an

"other source" under section 404.1513(d), the ALJ must provide "reasons that are germane" to that witness in order to discredit that testimony.  <u>Dodrill v. Shalala,</u> 12 F.3d 915, 919 (9th Cir. 1993).  The ALJ's assessment that Dr. Suel's post-hearing responses to the questionnaire conflict with the pre-hearing progress notes of Plaintiff's other treating physicians is not supported by that evidence and is not a sufficiently germane reason for rejecting Dr. Suel's assessment.  (AR at 18.)  Indeed, Dr. Suel's assessment is consistent with the only other document provided by Dr. Suel besides his questionnaire, a letter dated December 8, 2004, which suggests that Plaintiff needs financial assistance which "would help to alleviate some portion of her depression and sense of helplessness and hopelessness." (AR at 136.)  In that letter, Dr. Suel also notes that, at that time, Plaintiff had the ability to work "minimally" but that her condition may deteriorate "to the point where what little work she is capable of performing, will become impossible."  (<u>Id.</u>)  In April 2004, Plaintiff reported depression, anxiety, and her visits to Dr. Suel, to Dr. Follette (AR at 146, 147).  Although the degree of impairment, if any, is not clear, Dr. Follette did prescribe a trial of Lexapro. (AR at 147.)  Other than these intermittent references to "depression" or "anxiety" noted in the records of Dr. Follette and Dr. Szydlo, there are no actual mental heath treatment records.  Nor is there any assessment from a physician of the degree of functional limitations Plaintiff may have as a result of her depression, if any.  Also, if Plaintiff had, in fact, been seeing Dr. Suel on a weekly basis since April 2004 (AR at 169), it is not unexpected that she would not repeat her emotional problems to those who were treating her for other matters.

Accordingly, the record is unclear whether Plaintiff's depression is severe, i.e., more than minimally affects her ability to perform work-related functions.

Plaintiff's testimony in that regard is not particularly helpful.[6]  (See infra, § B.)
Nor is it clear whether there are any functional limitations arising from Plaintiff's
fibromyalgia or depression.  That an impairment may be non-severe does not
mean that there may not be some restrictions, and the regulations specifically
provide that even non-severe impairments are considered in the assessment of
residual functional capacity.  20 C.F.R. § 404.1545.

Based on the foregoing, the matter requires remand for further evaluation
of Plaintiff's depression and fibromyalgia.

**B.    The ALJ's Credibility Finding**

Once Plaintiff has established by objective/clinical evidence the existence
of a medically determinable impairment which may reasonably account for the
symptoms alleged, although not necessarily the degree of symptoms alleged,
absent an affirmative evidence of malingering, the ALJ may not disregard such
allegations without providing clear and convincing reasons for doing so.  Batson
v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1196 (9th
Cir. 2004).  Here, the ALJ found that "[t]he claimant's allegations are not entirely
credible."  (AR at 19.)

In addition to her loss of vision, Plaintiff testified that she had "lots of
depression and pain."  (AR at 43.)  She testified that she had pain most
particularly in the back, shoulders, and hips.  (Id.)  She also had headaches and
stomach pain due to irritable bowel syndrome.  (Id.)  She takes Neurontin for the
pain of her fibromyalgia which helps although she still has pain.  (AR at 44.)  At
the time of the hearing, she had been seeing Dr. Szydlo for about three years

_____

[6]  However, Plaintiff correctly cites SSR 85-28 for the proposition that "[i]f
an adjudicator is unable to determine clearly the effect of an impairment or
combination of impairments on the individual's ability to do basic work activities,
the sequential evaluation process should not end with the not severe evaluation
step."  (JS at 8.)

"[a]bout every three months." (Id.) The pain limits her activities in that it "fatigues" her, "everything hurts," and her symptoms come "in these waves. Sometimes it's more severe than others." (Id.) However, Plaintiff offered little testimony as to the degree of fatigue or the frequency of "these waves." Also, there is very little in her testimony as to the actual degree of functional loss.

Similarly, there is very little in Plaintiff's testimony that suggests the degree of functional limitation, if any, caused by her depression. When asked about the effects of her depression, she consistently reverted to a discussion concerning her inability to work due to her vision:

> Q.   How often do you feel depressed?
>
> A.   (INAUDIBLE)
>
>      . . .
>
> Q.   You're not working now. Does it affect you at home?
>
> A.   Yes, I mean it's almost like you aged 30 years or something from seeing one way and as a designer, it's very important. And then all of a sudden, the next day it's not there.

(AR at 45-46.)

When asked again about her depression, she again testified about her visual impairment:

> Q.   So you had depression – you were depressed even when you were working in the field of architectural design?
>
> A.   Well, yes, at times. It was just I felt depressed, but I could work, I could see.
>
> Q.   And if you tried to work now, what do you think would happen?
>
> A.   It's much different now. It's – to see what I used to see – it's just – to draw architectural plans and – I don't see what I'm supposed to see. I cannot do the details. . . .

(AR at 46-47.)

16

1    The fact that Plaintiff is more depressed now as a result of her vision

2    problems is understandable.  However, this fact does not mean that she has any

3    limitations as a result of the depression.  Also, Plaintiff's own testimony fails to

4    indicate that her depression equates to disability.  Higgs v. Bowen, 880 F.2d 860,

5    863 (6th Cir. 1988) (the mere diagnosis of an impairment "says nothing about the

6    severity of the condition.").

7    Plaintiff also claims that "[t]he ALJ's discussion of evidence concerning

8    Plaintiff's vision impairment was incomplete and insufficient" because "she

9    failed to consider plaintiff's testimony that her eye hurt and she experienced

10   dizziness, almost like motion sickness . . . [and] that with her left eye she found it

11   difficult to read a computer because she experienced headaches." (JS at 14.)

12   Plaintiff contends that the ALJ was required to consider this testimony.  (Id.)

13   However, Plaintiff points to nothing in the record to establish that the eye pain or

14   dizziness added to the visual restrictions which the ALJ found.  Nor does she cite

15   any evidence that these symptoms were so significant as to require treatment.

16   The ALJ is not required to comment upon and evaluate every incidental

17   subjective complaint.  See Vincent on Behalf of Vincent v. Heckler,  739 F.2d

18   1393, 1395 (9th Cir. 1984) (the ALJ "need not discuss all evidence presented to

19   her.  Rather, she must explain why 'significant probative evidence has been

20   rejected.'").  Notwithstanding that this testimony did not rise to the level of

21   "significant probative evidence," the ALJ did note that the medical record

22   revealed little in the way of abnormal findings or significant functional limitations

23   in the left eye.  (AR at 17.)  Indeed, a review of the record generally fails to reveal

24   any ongoing complaints, significant findings, or need for treatment in the left eye.

25   (AR at 17; see also AR at 120, 121, 137, 139, 141.)

26   Plaintiff further asserts that the ALJ's credibility analysis is flawed because

27   she failed to consider the multiple factors for evaluating credibility enumerated in

28

17

SSR 96-7p,[7] including Plaintiff's daily activities, the side effects of medication (JS at 13-14), "the degree to which Plaintiff's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, the consistency of the individual's own statements, and the consistency of Plaintiff's statements with other information in the case record."  (JS at 17.)

The ALJ was not required to discuss and analyze all of the factors enumerated in SSR 96-7p.  Rather she must give consideration to these factors. Here, the record as a whole reflects adequate consideration.  For example, testimony was elicited about Plaintiff's daily activities although the ALJ did not specifically address these activities in her credibility determination.  (AR at 49-50; see also AR at 73-77.)  However, Plaintiff apparently believes that, had the ALJ given a more thorough review of her daily activities as expressed in her Daily Activities Questionnaire of June 2004 rather than upon a "cursory review of the medical record," the determination would somehow be different.  (JS at 14.) Plaintiff contends this questionnaire indicates that "she had been suffering lots of anxiety and a sleep disorder.  She used medication frequently to help her sleep and was worried about her loss of vision.  She needed help with shopping (AR

---

[7] These factors are:
1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms and
7. Any other factors concerning the individual's functional limitations and  restrictions due to pain or other symptoms.

73-78)."  (JS at 14.)

There is nothing in this summary or in Plaintiff's own description of her daily activities that advances her argument.  In the Daily Activities Questionnaire, Plaintiff reported that she cooked, shopped, did all her household chores other than ironing, and usually did not require help in completing these chores unless it was "detailed work."  (AR at 74.)  She attended performances and visited museums, and she participated in yoga and went for walks, although she no longer participated in more strenuous activities such as bike riding, running, or swimming.  (Id.)  She listened to the radio and watched television, and she was able to remember most of what she had heard or seen.  (AR at 75.)  She still was able to read (AR at 75), although she had difficulty doing so due to vision problems (AR at 77), and she still was able to manage self-care tasks.  (AR at 73.)

Plaintiff argues that the ALJ erred in failing to give adequate consideration to the degree of consistency of Plaintiff's complaints with the medical signs, laboratory findings, and other information in the record.  (JS at 17.)  However, other than asserting that Plaintiff's "statements were generally consistent with the medical record," Plaintiff cites to nothing in the record as support and even concedes the reasonableness of the ALJ's finding concerning the infrequency of treatment.  (JS at 17.)  Even Plaintiff's own testimony does not reflect the extent of the impact of her multiple impairments on her functional abilities, and a review of the record does not suggest the high level of consistency with her statements which she now asserts.  For example, Plaintiff's testimony suggests a much greater frequency of visits with Dr. Szydlo than is revealed in the treatment records.  (Compare AR at 44 with AR at 113-15, 116-18, 124-25, 148-55, 157.)  Significantly, although Plaintiff claims that the ALJ should have considered her complaints of left eye pain and other symptoms, Plaintiff does not claim that the visual residual functional capacity found by the ALJ is flawed or that the ALJ improperly found the left eye impairment to be non-severe.

Consequently, to the extent that Plaintiff claims her subjective complaints render her totally disabled, the ALJ provided sufficiently clear and convincing reasons for rejecting such claims by citing the lack of frequency of treatment for fibromyalgia,[8] her ability to work until she was laid off,[9] and her failure to list fibromyalgia as a disabling impairment in her application.[10]  However, Plaintiff argues that she "never claimed . . . that the Fibromyalgia caused her to stop working."  (JS at 8.)  Therefore, although sufficient to reject Plaintiff's claim of total disability, as previously discussed, these reasons are not sufficient to dispute Plaintiff's claims that her impairment is "severe."

With respect to Plaintiff's depression, the ALJ's finding of a lack of frequent treatment is not supported by substantial evidence when the record indicates that Plaintiff had sought weekly mental health counseling, albeit from a therapist with a doctoral degree rather than a psychiatrist or psychologist, since April 2004.  This is particularly true when the medical evidence suggests that the depression, while not disabling per se, may manifest itself through physical channels as well as emotional channels, as it "do[es] in ALL patients with fibromyalgia."  (AR at 175 (emphasis in original).)  See Lester, 81 F.3d at 829-30.

Based on the foregoing, while the reasons cited by the ALJ for rejecting

_____

   [8]  See Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (minimal conservative treatment is a proper factor to be considered in evaluating credibility); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (lack of medical treatment belied the debilitating pain alleged).

   [9]  See Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001).

   [10]  See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (the fact that claimant did not allege a particular impairment in her application for disability benefits "is significant," even if evidence of the impairment  was later developed).

Plaintiff's claim of total disability are sufficiently specific, they are not sufficient to discredit Plaintiff's testimony that her depression and fibromyalgia are severe impairments.

**C.** **The ALJ's Reliance Upon the Vocational Expert's Testimony**

"In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." Thomas, 278 F.3d at 956 (quoting Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995)).

Plaintiff argues that the ALJ's reliance upon the VE's testimony was incomplete because "[m]edical evidence from several treating sources was submitted to the ALJ after the hearing which established more significant functional limitations, but no supplemental hearing was held, nor did the ALJ have any further contact with the VE." (JS at 18.)  Plaintiff faults the ALJ for her failure to ask the VE:

> to assume there were exertional limitations resulting from Plaintiff's Fibromyalgia as noted by Dr. Szydlo, or that there were other non-exertional limitations.  The ALJ did not ask the VE to assume Plaintiff experienced frequent headaches, dizziness and fatigue or that, because of chronic pain, she was depressed and anxious and would be expected to have difficulty thinking and concentrating, performing at a consistent pace, and dealing with normal work stress.

(JS at 18.)

However, these extensive restrictions, posited by Dr. Szydlo, were properly rejected by the ALJ as inconsistent with the doctor's own treatment notes.  Also, any inference that Plaintiff is totally disabled by reason of the fybromyalgia-related limitations assessed by Dr. Szydlo is not supported by Plaintiff's own testimony, including her own statement that she has never claimed that she stopped working due to fibromyalgia.  Consequently, the ALJ was not required to

include Dr. Szydlo's assessment in her hypothetical question to the vocational expert.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (the ALJ did not err in omitting limitations that Rollins claimed but had failed to prove).

Similarly, that Plaintiff might have "experienced frequent headaches, dizziness and fatigue or that, because of chronic pain, she was depressed and anxious and would be expected to have difficulty thinking and concentrating, performing at a consistent pace, and dealing with normal work stress" need not be included in the hypothetical question to the VE when Plaintiff herself is unable to cite anything in the record (other than Dr. Suel's currently unsupported assessment) which would quantify the degree of functional limitations, if any, resulting from these symptoms.

However, because remand is required, and it is anticipated that a new residual functional capacity assessment will have to be made based on additional evidence regarding Plaintiff's fibromyalgia and depression, Plaintiff will have ample opportunity to question the VE concerning any limitations.

## VI.

## REMAND

In summary, this Court finds as follows:

1.     The ALJ's reasons for rejecting the limitations expressed by Dr. Szydlo in the February 14, 2005, questionnaire were clear and convincing;

2.     Notwithstanding the above, substantial evidence does not support the ALJ's finding that Plaintiff's fibroymalgia is not severe.  With the assistance of Plaintiff's attorney who can provide information concerning recent treating sources, the ALJ should obtain all updated treatment records from Dr. Szydlo or any other treating physician;

3.     The ALJ's reason for rejecting the limitations expressed by

Dr. Suel in the February 7, 2005, questionnaire was not germane and proper; and

4.    The record is inadequate to determine whether Plaintiff's depression is severe.

5.    The ALJ should proceed with the sequential evaluation procedure and assess Plaintiff's residual functional capacity including any limitations attributable to her fibromyalgia and depression.  Upon remand, the ALJ should:

    a)    Obtain all relevant mental health treatment records, most particularly the records of Mr. Suel's weekly therapy sessions with Plaintiff;

    b)    Refer Plaintiff to a consultative examiner in the field of psychiatry or psychology along with the records obtained from Mr. Suel, if made available within a reasonable time;

    c)    If deemed necessary, call upon the services of a medical expert in the field of psychiatry or psychology to testify at the hearing;

    d)    Give due consideration to the effects of Plaintiff's depression upon her fibromyalgia complaints;

6.    The ALJ's finding that Plaintiff's left eye impairment is not severe is based upon substantial evidence;

7.    To the extent that Plaintiff's testimony can be interpreted as indicating a disabling level of impairment due to fibromyalgia and/or depression, the ALJ's reasons for rejecting such an inference were sufficiently clear and convincing.

    a)    However, when considered in light of Plaintiff's claim that she has never alleged that the

23

fibromyalgia was disabling but rather that it was sufficient to meet the "severity" criteria, the ALJ's reasons for rejecting Plaintiff's testimony are not sufficiently clear and convincing.

b) With respect to Plaintiff's depression, the ALJ's rejection of claims of a "severe" depression as belied by the infrequency of treatment is specific but not legitimate in light of weekly therapy sessions.

c) Because there are insufficient findings as to whether Plaintiff's testimony should be credited as true, new credibility findings will have to be made. The ALJ is free to reconsider her decision with regard to Plaintiff's fibromyalgia and depression, including Plaintiff's credibility on these complaints. <u>Connett</u>, 340 F.3d at 876;

8. A new residual functional capacity assessment is required;

9. A vocational expert again should be called.

/ / /

/ / /

/ / /

/ / /

/ / /

## VII.

## <u>ORDER</u>

Pursuant to sentence four of 42 U.S.C. § 405(g), IT IS HEREBY ORDERED THAT Judgment be entered reversing the decision of the

Commissioner of Social Security and remanding this matter for further

administrative proceedings consistent with this Memorandum Opinion.


Dated: March 7, 2007

HONORABLE OSWALD PARADA
United States Magistrate Judge

25